**Nos. 15-50138 and 15-50193**

# United States Court of Appeals
### FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

DARREN DAVID CHAKER,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
15CR7012-LAB*

**ANSWERING BRIEF FOR THE UNITED STATES**

LAURA E. DUFFY
*United States Attorney*

PETER KO
*Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division*

HELEN H. HONG
*Assistant U.S. Attorney*

*880 Front St., Rm. 6293
San Diego, CA 92101
(619) 546-6990*

**TABLE OF CONTENTS**

Page

Jurisdiction and Bail Status — 1

Questions Presented — 2

Statement

Summary of Argument — 28

Argument — 30

A. The Plain Language of the Condition Imposes Limits on
Chaker's First Amendment Rights to the Extent He
Engages in      Speech or Conduct That Harasses Others — 30

   1. Standard of Review — 30

B. Sufficient Evidence Supported Chaker's Revocation of
Supervised Release — 49

   1. Standard of Review — 49

C. The Revocation Court Did Not Abuse Its Discretion in
Imposing Conditions 5, 11 and 13 — 54

   1. Standard of Review — 54

Conclusion — 58

Certificate of Compliance

Statement of Related Cases

**TABLE OF AUTHORITIES**

Cases:

*Artichoke Joe's Cal. Grand Casino v. Norton*,
  353 F.3d 712 (9th Cir. 2003) — 56

*Chickasaw Nation v. United States*,
  534 U.S. 84 (2001) — 33

*Comite de Jornaleros de Redondo Beach v.*
 *City of Redondo Beach*,
  657 F.3d 936 (9th Cir. 2011) — 35

*Corley v. United States*, 556 U.S. 303 (2009) — 55

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) — 28, 37

*Rodriguez v. Maricopa Cty. Commun.*
 *College District*, 605 F.3d 703 (9th Cir. 2010) — 34, 48

*United States v. Acquino*,
794 F.3d 1033 (9th Cir. 2015)                           31, 49, 54
*United States v. Alexander*,
106 F.3d 874 (9th Cir. 1997)                                    51
*United States v. Bahe*, 201 F.3d 1124 (9th Cir. 2012)          39
*United States v. Bare*, No. 14-10475,
2015 WL 7434629 (9th Cir. 2015)                                 39
*United States v. Bee*, 162 F.3d 1232 (9th Cir. 1998)           40
*United States v. Bolinger*,
940 F.2d 478 (9th Cir. 1991)                               40, 43
*United States v. Clark*, 918 F.2d 843 (9th Cir. 1990),
overruled on other grounds, *United States v. Keys*,
133 F.3d 1282 (9th Cir. 1998)                                  41
*United States v. Furukawa*,
596 F.2d 921 (9th Cir. 1979)                                   39
*United States v. Gallo*, 20 F.3d 7 (1st Cir. 1994)            30
*United States v. Gnirke*,
775 F.3d 1155 (9th Cir. 2015)            31, 34, 40, 44, 47, 55
*United States v. Hayes*,
283 F. App'x 589 (9th Cir. 2008) (unpublished)            40, 57
*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009)                                 41
*United States v. Hugs*, 384 F.3d 762 (9th Cir. 2004)         46
*United States v. Juvenile #1*,
38 F.3d 470 (9th Cir. 1994)                                   40
*United States v. Kincade*,
379 F.3d 813 (9th Cir. 2004)                              38, 39
*United States v. Lomayaoma*,
86 F.3d 142 (9th Cir. 1996)                                  49
*United States v. Lowe*, 654 F.2d 562 (9th Cir. 1981)        38
*United States v. Morrison*,686 F.3d 94 (2d Cir. 2012)       48
*United States v. O'Donnell*,
482 F. App'x 256 (9th Cir. 2012) (unpublished)              39
*United States v. Osinger*,
753 F.3d 939 (9th Cir. 2014)                    32, 34, 47, 48
*United States v. Richards*,
385 F. App'x 691 (9th Cir. 2010)                            44

iii

*United States v. Ross*, 476 F.3d 719 (9th Cir. 2007)          40

*United States v. Sandsness*,
  988 F.2d 970 (9th Cir. 1993)                                 30

*United States v. Soltero*,
  510 F.3d 858 (9th Cir. 2007)          31, 40, 41, 44, 47

*United States v. Vega*, 545 F.3d 743 (9th Cir. 2008)          39

*United States v. Verduzco*,
  330 F.3d 1182 (9th Cir. 2003)                                49

*United States v. Watson*,
  582 F.3d 974 (9th Cir. 2009)                         31, 39, 46

*United States v. Wolf Child*,
  699 F.3d 1082 (9th Cir. 2012)                                41

Statutes:

18 U.S.C. § 152(3)                                              1
18 U.S.C. § 157(3)                                              1
18 U.S.C. §§ 3231                                               1
18 U.S.C. § 3583(e)(3)                                       1, 50
28 U.S.C. § 1291                                                2

Rules:

Fed. R. App. P. 4(b)(1)                                         2

Miscellaneous:

Black's Law Dictionary 415 (8th ed. 2004)
                                  31, 32, 33, 47, 53, 54

Eugene Volokh, *One-to-One Speech vs. One-to-Many
  Speech, Criminal Harassment Laws, and
  Cyberstalking*, 107 Northwestern Univ. L. Rev.
  731, 751 (2013)                                              34

Webster's Third New Int'l Dictionary (1981) ..... 31, 32, 33

iv

**Nos. 15-50138 and 15-50193**

# United States Court of Appeals

## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

DARREN DAVID CHAKER,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
15CR7012-LAB*

### JURISDICTION AND BAIL STATUS

Darren David Chaker (Chaker) appeals the district court's revocation of supervised release and imposition of special conditions of supervised release. The district court had jurisdiction under 18 U.S.C. §§ 3231 and 3583(e) over the revocation of Chaker's release, as Chaker had been charged in the Southern District of Texas with offenses against the laws of the United States, i.e., bankruptcy fraud in violation of 18 U.S.C. § 157(3) and a false declaration in violation of 18 U.S.C. § 152(3). Excerpts of Record (ER) 231, 265. Chaker was convicted after a bench trial of the bankruptcy fraud count, ER 247, and sentenced to 15 months in custody, followed by 3 years of supervised release. ER 265-268. Chaker's supervision was transferred to the

1

Southern District of California.  ER 229.  On March 30, 2015, the district court revoked Chaker's supervised release and entered final judgment, imposing a sentence of time served, followed by 30 additional months of supervised release.  Clerk's Record (R) 33. The district court issued an amended judgment on April 17, 2015, adding special conditions of release.  ER 5-7.  Chaker timely noticed his appeal of the judgment and amended judgment on March 30 and April 29, 2015.  Fed. R. App. P. 4(b)(1); ER 1-4. This Court has jurisdiction under 28 U.S.C. § 1291.  Chaker is not in custody.

### QUESTIONS PRESENTED

1.    Whether the plain language of the supervised release condition permissibly prohibited Chaker from engaging in harassment.

2.    Whether the district court abused its discretion in concluding that Chaker intended to harass a prior victim that he had harassed over the course of a year.

3.    Whether the district court abused its discretion in imposing three additional conditions of release, which were each designed to combat Chaker's harassing behavior.

**STATEMENT**

a. Chaker's Intimidating and Harassing Conduct

For nearly two decades, Chaker waged harassment campaigns against numerous victims to seek retribution or to get his way. Presentence Report (PSR) ¶¶41, 43-54, 57-60, 65-69. Chaker used overt threats in some cases and veiled threats in others. In many instances, Chaker attempted to extort compliance with his demands by threatening to publish information about his victims online, including social security numbers, privately taken nude photographs and videos, and home addresses. He challenged law enforcement offices, by threatening to publish rosters of all their employees online, including their names, sex, salaries and home addresses. And in many cases, Chaker followed through with his threats, publicizing information about his victims online, via email, and through hand delivered pamphlets.

Between 1996 and 2014, Chaker placed threatening phone calls to his victims, PSR ¶ 41; sent nude photographs of a victim to her employer, PSR ¶ 43; threatened to post inappropriate videos and social security numbers online, PSR ¶ 45; distributed pornographic videos and photographs of a victim throughout a high school, PSR ¶¶ 45, 49; threatened to publish social security

numbers and "embarrassing medical information" of attorneys who represented an adverse party in a civil suit, PSR ¶ 46; demanded law enforcement in Texas investigate his ex-girlfriend's father, or risk having the information of every officer posted online and distributed to "organizations that might be hostile to law enforcement," PSR ¶ 50; threatened to post the home addresses of every Nevada Office of Attorney General investigator online, PSR ¶ 53; and created websites in the name of an investigator and the Attorney General of Nevada with the threat to post unflattering content in his effort to engage in "internet harassment" and "cyberbullying." PSR ¶ 53. And because of 34 baseless civil suits he filed in the San Diego Superior Court, the Superior Court identified Chaker as a "vexatious litigant"—a label reserved for individuals who repeatedly file lawsuits that are unfounded and lacking in merit. PSR ¶ 60.

Chaker's targets were not random. Chaker harassed five different ex-girlfriends, PSR ¶¶ 41, 45, 46, 49, 51, 65-68; the parents of his ex-girlfriends, PSR ¶ 45, 49, 50; the sister of an ex-girlfriend, PSR ¶ 41; lawyers representing his ex-girlfriends, PSR ¶ 46; law enforcement officers involved in his disputes with his ex-girlfriends, PSR ¶ 50, 53, ER 226; and lawyers representing corporations involved in matters involving Chaker, PSR ¶52.

Many victims "stressed they were in fear of their lives due to Chaker's harassment [and] his threats." PSR ¶¶ 46, 66.

Though his methods were varied and his victims numerous, his aim was the same: retaliate against them for taking action against him or bully his victims into acceding to his demands. He retaliated against an ex-girlfriend for testifying against him in a pending criminal matter, PSR ¶ 41; retaliated against an ex-girlfriend for obtaining a restraining order against him, PSR ¶ 43; retaliated against an ex-girlfriend who was engaged in a custody battle over their child, PSR ¶ 45; threatened the attorney of an ex-girlfriend who was representing her in a civil protection suit against Chaker, PSR ¶ 46; retaliated against the mother of his ex-girlfriend after he lost a custody battle, PSR ¶ 49; threatened the Harris County Constable's Office after it reportedly did not investigate his ex-girlfriend's father as he had requested, PSR ¶ 50; retaliated against and threatened the lawyers of a company that refused to remove information about him from their website, PSR ¶ 52; and retaliated against an investigator for the Nevada Office of the Attorney General for failing to help him in his custody proceeding, PSR ¶ 53.

Although Chaker did not sustain any criminal convictions as a result of his conduct, he was asked to answer for his conduct in

court proceedings and before law enforcement agencies. One ex-girlfriend obtained a temporary restraining order against Chaker in 2006. PSR ¶ 41. It was extended for a five-year period. *Id.* Chaker nonetheless continued to harass the victim, who reported four violations of the restraining order. PSR ¶ 43. Another ex-girlfriend filed a civil suit seeking a protection order against Chaker, because she reported that he "continuously stalked and harassed her since 1996." PSR ¶ 46. The attorneys representing her filed a police report to document Chaker's "extortion attempt" in 2010, because he had threatened them with bar grievances if they did not comply with Chaker's demands. *Id.* Another ex-girlfriend's mother filed a report with a federal internet crime database about "harassing emails" she received from Chaker in 2012 that were so voluminous that she retained an attorney to file civil suit as well. PSR ¶ 49. The United States Postal Inspector's Office received a report that Chaker had threatened the Harris County Constable's Office in "retaliation for non-compliance [with] Chaker's demands[.]" PSR ¶ 50. A law firm filed a complaint with the Federal Bureau of Investigation in 2013 based on Chaker's efforts to harass and cyber bully the firm, its lawyers and its clients. PSR ¶ 52.

6

Through at least 2012, Chaker billed himself online as an expert on "sexual harassment via email, instant messaging and other forms of electronic communication, . . . [and] internet usage." PSR ¶ 78. He funneled that "expertise" into leveraging information to harass his victims on the internet, ranging from threats to post home addresses of law enforcement online, PSR ¶ 53; to threats to post the name, sex, title, ethnicity and salary of every officer in a law enforcement office on a website (ominously noting that he "would not be held responsible for any harm that might occur to the employees as a result of the postings"), PSR ¶ 50; to threats to post the social security numbers of individuals, PSR ¶¶ 45, 46; to threats to post sensitive medical information of a doctor who treated his ex-girlfriend. PSR ¶ 46. In short, Chaker recognized the power of the internet and the value of information, and attempted to extract compliance with his demands by threatening the reputations of individuals who he felt aggrieved him.

While Chaker disregarded the reputation and privacy of others, he jealously guarded his own. He complained when others allegedly posted "unflattering information about him on various websites," threatening a law enforcement agency with publication of information about all of its employees because one deputy was

7

allegedly involved in posting derogatory information about him. PSR ¶50. He harassed and cyberbullied a law firm, its attorneys, and even random clients of the firm because a website represented by the law firm refused to remove information about him. PSR ¶ 52. He secured an official name change to hide his identity from alleged "stalkers," and joined a program that allowed him to maintain his mailing address, home address, workplace and school locations "free from public records access." PSR ¶ 70. Chaker filed a civil suit against others for defamation, which was ultimately stricken by the Superior Court. PSR ¶ 68. And Chaker was associated with 10 different aliases and six separate social security numbers. PSR at 2.

It was with this history that Chaker appeared before District Judge Nancy F. Atlas in the Southern District of Texas to answer the bankruptcy fraud charge. ER 230-264. But even while under pre-trial supervision, Chaker continued to harass and threaten others. Indeed, he threatened the reputation of even the attorneys appointed to represent him. Chaker cycled through five different attorneys—unprecedented before Judge Atlas, SER 53 ("I can't think of any case and I am unaware of any case where five different lawyers have been appointed.")—because Chaker threatened to file state bar grievances against four of them and

pledged "to ruin their reputations on the internet" when he felt unhappy with their work.  SER 58; *id.* at 46 ("But I can't give you lawyers when you threaten them, to ruin them on the Internet, to file bar grievances which, frankly, become terribly problematic, when what they've done is not respond to you on every single issue."); *id.* at 47 ("So we have some issues here because there have been four lawyers in this case and you have driven every one of them away."); *id.* ("[Y]ou don't seem to be able to work with and threaten and file grievances against the others. . . . That is abusive."); *id.* at 58 ("[Y]ou need to understand you cannot abuse other people because they don't see the way you do—see something the way you do."); *id.* at 62 ("And I want you to understand also that your conduct with these lawyers could be easily classified as abusive.").

Chaker did not limit his harassment and threats to his attorneys.  Judge Atlas revoked Chaker's bond after trial, concluding that Chaker presented a danger to others based on his conduct while on release.  SER 286-87.  After a five-hour evidentiary hearing, Judge Atlas expressed her concern that "Mr. Chaker, when he's very upset, takes extraordinary measures intended to harm others either in their reputation or in their person, either by raising the profile of those people in order for

9

others to retaliate or by Mr. Chaker retaliating." SER 287. Judge Atlas described how Chaker engaged in a "pattern of harassment and intimidation of others when he feels it is important to get his way." SER 285. She specifically identified Chaker's modus operandi:

> Mr. Chaker, through his emails and his use of the internet is intimidating and posing a threat, a serious threat to people by repeatedly posting their home addresses with statements that raise the hint of danger or suggestions that things could happen. It can incite others and it can also indicate a pattern or an intent of his. It was clearly for intimidation and I think it poses danger to the safety of those lawyers. . . . And the fact of the matter is, that Mr. Chaker's conduct is a problem.

SER 286. Judge Atlas ultimately tied Chaker's intimidating behavior to his mental state and described how she feared escalation from "mere" online harassment: "I think that his emotional state and his desperation poses—puts him emotionally and mentally in a state where he could cause physical harm to" the targets of his retribution. *Id.*

Judge Atlas's remarks followed the testimony of two witnesses who were intimidated and harassed by Chaker, even while he was on pretrial release. The first witness, Maria Crimi Speth, testified about a three-year period of consistent

10

harassment from Chaker, designed to retaliate for failing to heed Chaker's commands. SER 150-196; SER 306-55. As Speth explained, she was an attorney with 25 years of experience, who was an equity partner at the firm of Jaburg & Wilk in Phoenix, Arizona. SER 150-51. As part of her duties, Speth represented Xcentric Ventures, which operated the website ripoffreport.com. SER 151. The website allowed individuals to post comments about businesses or individuals. *Id.*

In approximately June 2010, Chaker contacted Xcentric, requesting that a negative post about him (calling him a pimp, fraud and solicitor of prostitutes) be taken down. SER 152. When Xcentric did not honor the request, Chaker spent three years threatening to publish information about Speth's firm and its lawyers to intimidate and embarrass them.

Chaker's efforts were not subtle. For example, he emailed the general counsel for Xcentric, David Gringas, a photograph of himself holding an assault rifle. SER 156; SER 309, 313. That photograph was interpreted as a threat. SER 156. In other instances, he wrote about enjoying his Second Amendment rights. Chaker wrote Speth that he would "continue to enjoy my Second Amendment right as I recently had a former conviction for possessing an assault rifle with a sniper scope expunged, which

allows me the joy of shooting. Thankfully, Arizona nor 38 other states do not have such laws concerning assault weapons as California does." SER 331; SER 163-64. Chaker also sent the founder of ripoffreport.com and Speth a link to a video "about inciting suspects to resist arrest and being tear gassed in . . . car vents." SER 309, 320.

Chaker also instilled fear in his targets by going to great lengths to show that he could access them in Arizona. In July 2011 (one year after Chaker initially contacted Xcentric), Chaker sent Speth an email that enclosed a deed to her property and photographs that had been taken of Gringas's front door. SER 161. On September 11, 2012 (now over two years after the odyssey began), Chaker wrote Speth "I am sure you are pleased to know I am in Arizona now." SER 161, 311, 338. On January 14, 2013, a client of Jaburg & Wilks—wholly unrelated to Xcentric or ripoffreport.com—received a hand-delivered letter at her home address. The letter was addressed to Speth and detailed Chaker's complaints relating to the posts on ripoffreport.com. Speth took the hand-delivered letter to be a clear signal from Chaker that he was physically in Arizona. SER 169, 311, 347-48.

As he did often, Chaker claimed that his communications were protected by the First Amendment. For example, in

connection with his photograph of Gringas's front door, he wrote "photography is a form of speech and reposting publicly available information is protected." SER 326. This was consistent with repeated prior claims that the First Amendment protected his communications. SER 322 (stating that his harassing communications were protected because they did not "cross the line of defamation while any statement will be reasonably couched in opinion"); see also SER 315 (Chaker threatening to "publish information within the scope of my First Amendment right" which tied Speth's law firm to allegations of sexual misconduct); SER 331 ("Most recently, a federal appellate court determined it was not unlawful to repost social security number information on the Internet since such is within the scope of the First Amendment."); SER 345 ("I have been forced to email 140 attorneys in Phoenix for representation . . . Of course, merely contacting attorneys for representation is not actionable."). And at least in words, Chaker claimed that he was not inciting violence or advocating harm toward Speth and her clients.

But in the same breath, Chaker publicly linked Speth, attorneys at her firm and her clients to a polarizing figure known to have received multiple death threats. Though he disavowed any express intent to harm Speth or her firm members, Chaker's

communications made clear that he was intentionally linking the polarizing figure to the home addresses of the figure's lawyers. SER 162, 328 ("I may be aware of various people who have threatened the safety of [an employee of Ripoff Report.com] but will not advocate injury . . . to you, member of the firm, or family members or even Gingras, while connecting who defends [the employee of Ripoff Report.com] with publicly available records."). Speth interpreted these efforts as a threat, fearing that those who had threatened the figure would soon know "how to find me and my family." SER 162

Chaker did the same in August 2013, but this time publicly linked the home addresses of every female attorney in Speth's firm to the polarizing figure. In that blog post from August 2013, Chaker wrote "Darren Chaker does not promote injury to the lawyers but does provide the home addresses of its female attorneys, since females appear to listen better, in an effort to keep open channels of communication." SER 173, 352. In that blog post, Chaker linked to an article in Forbes magazine where a ripoffreport.com employee reported that "he has gotten so many death threats that he doesn't like people to know where he lives." *Id*. In the post, Chaker wrote that "if you can't find [the employee of ripoffreport.com] to communicate with, then seek out the

attorneys who defend it[.]" SER 352, 354.  The post then listed the names and home addresses of the female attorneys.  Speth testified that the post was "just over the top threatening and outrageous."  SER 174; SER 194 ("And I think that the fact, again, that he picked the women in the firm to pick on and that he specifically said they listen better, I don't think it—I don't think you have to be a lawyer to figure out that he meant that women respond better because they're afraid.").  Soon, Chaker followed up by posting the home addresses of firm clients.  SER 174-75, 354.

These threats were coupled with other communications that, in context, were clearly designed to embarrass his subjects.  For example, he threatened to email a list of attorneys in Phoenix linking Jaburg & Wilks to allegations of sexual misconduct, SER 166, 340-43, and then followed through by emailing 140 attorneys in Phoenix with the information.  SER 167.  Chaker claimed to be protected under the law.  SER 345 ("I have been forced to email 140 attorneys in Phoenix for representation . . . Of course, merely contacting attorneys for representation is not actionable.").  Chaker threatened to email that same disparaging information to "another set of attorneys" and warned "no . . . . it won't end."  SER 167, 345.  Speth believed that Chaker was

attempting to "hurt our reputation perhaps with the pressure on our client to remove the post about him." SER 168.

Many of Chaker's missives would conclude with warnings. He would write, for example, that he would no longer practice "diplomacy. You will not hear from me again." SER 155-56; SER 309, 316. Chaker concluded another email with "This is my last email to you. I have done all I can for now, and will take a different course of action." SER 162, 331. He wrote online that failing to delete the derogatory information about Chaker from ripoffreport.com would lead to a "break down around here." SER 158. Chaker wrote "I'm not going to court and I'm going to lose it." SER 318.

Chaker's actions were interpreted as threats and as an effort to "frighten us enough . . . to remove the post from Ripoff Report." SER 158. In response to Chaker's actions, Speth showed her "teenaged daughter a picture of Mr. Chaker" and told her to call the police if she ever observed him. SER 159. Other targets of Chaker's harassment installed home security systems with video cameras as a result of his communications. SER 160. And ultimately, Speth reported Chaker to the police twice, though no action was taken. As Speth testified, "the first time I made a police report they did nothing and I was going [to] insist that

somebody do something because now he wasn't just threatening me, he was threatening my client[s], he was going to my client's house and it was just really disturbing." SER 169.

While intimidating Speth in the summer of 2013, Chaker was simultaneously retaliating against and threatening an investigator with the Nevada Attorney General's Office, as well. SER 198-273. The second witness who testified at the bond revocation hearing was Leesa Fazal. Fazal was a three-year veteran of the police force for the Nevada Office of the Attorney General, responsible for investigating missing children. SER 198-99. Fazal testified that she had previously worked as a police officer and detective at the Las Vegas Metropolitan Police Department. SER 198.

In approximately June 2013, Chaker contacted Fazal, seeking her assistance in enforcing an ex parte temporary sole custody order he had obtained from the San Diego Superior Court. SER 201-03. As Fazal explained, an ex parte order was issued without the mother's notice. SER 201. The ex parte order was issued in part based on an email that Chaker claimed he had received from the child's mother, S.A. SER 205-06. The email purportedly contained admissions from S.A. showing that she was

17

an unfit mother, and admissions about physically abusing their child. *Id.* But that email was fake.

In the course of investigating Chaker's request to enforce the ex parte order, Fazal learned that Chaker had hacked into S.A.'s email account and sent an email to himself to appear as if the mother had made damaging admissions. SER 209; SER 244-45. S.A. "adamantly" denied sending the email that formed the basis for the temporary custody order. SER 210-11. Fazal also learned that Chaker had previously hacked into S.A.'s email account in 2012, as well. S.A. told Fazal that she had recently discovered that a life insurance policy had been taken out in her name, identifying Chaker as a beneficiary. SER 251. S.A. disclosed that she was in "fear for her life and the life of her son, and that she thought that [Chaker] was going to hurt her or kill her." SER 217. Because of concerns about the validity of the custody order that Chaker had obtained, Fazal refused to assist Chaker in enforcing it.

Chaker was evidently displeased with Fazal's unwillingness to help him enforce the custody order. That became clear after a custody hearing approximately 30 days later. Fazal was subpoenaed to appear at a custody hearing in California in July 2013 by S.A.'s attorney. During the hearing, the judge revoked

18

the temporary custody order after learning that it had been issued based on fraud. SER 212. As Fazal left the hearing for a recess, she observed Chaker on the "corner of the street and he was clapping and staring at us in the car." SER 213. She later learned that Chaker had taken a photograph of her. *Id.* S.A.'s attorney, Scott McMillan, disclosed that he had hired a private investigator to accompany him to court on matters involving Chaker, because "he was scared that Chaker would do something that could harm him." SER 211.

After the recess, the judge denied all visitation rights to Chaker. SER 214. Chaker started shouting that Fazal had broken laws by carrying a firearm into a California courthouse. Chaker and his sister demanded that the bailiff place Fazal under citizen's arrest. *Id.* The sergeant and bailiff cleared Fazal, and told her to wait until Chaker had left for her own safety. SER 215. When Fazal left the courthouse, Chaker and his sister followed Fazal in their own vehicle. Fazal attempted to elude them, and when she ultimately got to her hotel, Fazal immediately retrieved her belongings and left because of fears for her safety. SER 216.

When Fazal returned to Nevada, Chaker waged a harassment campaign against her and her office. Fazal's office

received four separate requests for public information from Chaker. SER 223. Chaker wrote emails to Fazal, explaining that he would post the "roster of each employee at the Las Vegas office and enclose their home addresses online." SER 226. As Chaker had done with Speth, Chaker claimed the protections of the First Amendment to "republish" public records. *Id*. Fazal interpreted the communications as a threat, *id.*, in part because she worked covert investigations. SER 227. Chaker also notified Fazal that he had created a website titled leesafazal@blogspot.com and another website titled after the Attorney General of Nevada. *Id*. Although no content had been posted, Fazal interpreted the websites as an effort to harass and intimidate her. *Id.*

b. Imposition of Special Conditions of Supervised Release

By the time Chaker was ready for sentencing, Judge Atlas had considered this "extensive information about conduct by Mr. Chaker that is invasive," SER 437, including information contained in the PSR and, "most important[ly]," the information conveyed by Speth and Fazal at the bond revocation hearing. *Id.* Judge Atlas also considered information in the PSR about Chaker's mental and emotional health. PSR ¶¶ 72-74. The report indicated that Chaker had been diagnosed with depression and stress, and that he had been "seeing a doctor for emotional or

psychiatric problems in April 2012." PSR 72. He took medication to treat his condition. *Id.* Moreover, the report indicated that Chaker was diagnosed in 2001 with "Major Depressive Disorder with Paranoia" and prescribed medication to treat psychoses, described as "bipolar and schizophrenia." PSR ¶ 74.

Judge Atlas expressed concern about Chaker's behavior, and his demonstrated inability to respond to situations in an appropriate way. Judge Atlas therefore addressed Chaker's rehabilitation through special conditions of supervised release designed to temper his reactions when "upset with someone who you think has been unfair or mistreated you[.]" SER 438. Judge Atlas imposed the special condition that Chaker "may not stalk or harass others." *Id.* As Judge Atlas viewed it, it was not a question of whether Chaker's conduct in those instances was illegal or criminal. SER 437. Indeed, Judge Chaker could not say whether any of it would be unlawful or constitute a crime. *Id.*

But while Judge Atlas acknowledged that Chaker had First Amendment rights and "the right of free speech," SER 438, she underscored that Chaker could not continue to "threaten[] to indirectly invade people's privacy or harm them by putting things up on the internet such as home addresses with comments that you are going to—you won't harm someone but you know others

who may." *Id.* Judge Atlas counseled Chaker to "take the high road." *Id.*

Given Chaker's repeated efforts to insulate himself from liability by claiming the protections of the First Amendment, Judge Atlas reiterated that the special condition was not limited to "talking about legal. We're not talking about [F]irst [A]mendment." SER 439. In others words, those considerations would have to make way for the special condition that she imposed. "You don't need to be publicizing people's personal information *whether it's legal or not*." SER 440 (emphasis added).

Notwithstanding the special condition, Judge Atlas affirmed that Chaker was nonetheless free to use the computer and to otherwise speak. *Id.* But she cautioned Chaker to "be courteous," "be respectful." *Id.*

The special condition on the judgment read that Chaker "may not stalk and/or harass other individuals, to include, but not limited to, posting personal information of others or defaming a person's character on the internet." ER 219. At the hearing, Chaker agreed to abide by the condition.

c. Petition and Revocation

Chaker was released from custody in September 2014 and his supervision transferred to the Southern District of California.

Five months later, Chaker's probation officer submitted a petition to revoke supervised release, alleging that Chaker continued to post disparaging information online about Fazal and Scott McMillan (the attorney representing S.A. during the custody proceeding). As the petition alleged, Chaker posted about Fazal in six separate online entries, writing that Fazal had committed perjury, and suggesting in some posts that he had approached her neighbors to obtain private information about her family members. ER 225. According to the petition, Fazal worried that Chaker's "behavior could become more dangerous, given his extensive history of stalking." *Id.*

McMillan also reported that Chaker had published "false, scandalous and utterly libelous material" about him online. McMillan reported that Chaker had "spoofed" his email address to send an email to McMillan himself from McMillan's own email address, to show that Chaker could "send emails to others" posing as McMillan.

Chaker moved to dismiss the petition on First Amendment grounds. ER 199. At a hearing, the district court denied the motion, finding the condition amply supported by the record before the sentencing judge. ER 71-78. The United States elected to proceed only on Allegation 1 involving Leesa Fazal, given that

23

the activities relating to McMillan largely occurred before Chaker had been released from custody (at his halfway house).  ER 95.

Chaker admitted that he had posted information online about Leesa Fazal on Twitter, the blog leesafazal.blogspot.com, and on slideshare.net.  Between October 2014 and January 2015, Chaker had posted information about Fazal on at least 6 occasions.  Fazal noted "he is illustrating yet another pattern of obsession and I am in fear given his extensive history of stalking that it will only progress especially considering I have had no involvement in any of his cases in any way for well over a year." SER 538.  In one blog post, Chaker wrote

> Nevada Attorney General Investigator Leesa Fazal, is well known for making false statements in federal court.  If you are a criminal defense or civil rights attorney, material may be shared with you concerning false statements made by Fazal including court transcripts, public records requests, interviews with former neighbors, why Fazal was forced out of the Las Vegas Metro Police Department, along with interesting background of family, and other credible material for impeachment.  In my opinion, she exaggerates and thinks court is a soap opera, and believes her false statements will be forgotten.

*Id.*

The district court considered whether the blog post constituted harassment and whether Chaker had posted the

information with the intent to harass Fazal. ER 100 ("I mean that's what I'm focusing on is whether it's harassment[.]"); ER 107 ("I told you I was going to infer a requirement of scienter here, that he did it with the intent to harass[.]"); ER 118 (using ordinary, dictionary meaning of harassment). Considering the evidence before him (and Chaker's history with Fazal and others), the district court concluded that the post constituted harassment in the ordinary, dictionary sense and that Chaker had posted the information—in particular the post about Fazal having been "forced out" of the Las Vegas Metro Police Department—with harassing intent. That intent was proven through Chaker's history with Fazal and the fact that the information relayed was false.

Chaker argued that the communication could not constitute a violation of the special condition, unless the communication constituted "criminal stalking, criminal harassment, or civil defamation under the definitions that state law applies." ER 117. According to Chaker, that was because Judge Atlas excluded First Amendment speech from the scope of the condition, prohibiting only criminal or otherwise unlawful speech that is not protected by the First Amendment for the special condition. The district court disagreed, stating that Judge Atlas intentionally restricted

25

some of Chaker's First Amendment rights. ER 114. Given Chaker's history that was well known to Judge Atlas, the district court concluded that Judge Atlas meant to aid in Chaker's rehabilitation by preventing him from using the internet to disparage individuals for a vindictive or retributive purpose. ER 105. The condition essentially commanded of Chaker: "don't reveal private things, don't make stuff up about people that you're sideways with and post it in order to get leverage." ER 129. The district court concluded that Chaker had done just that.

Chaker was not severely sanctioned for the breach of the supervised release condition. The district court reminded Chaker "that you need to stop doing what instinctively you've done, which is to be vindictive toward people and get back to them by harassing or trying to extort them into action you want by threatening or making up stuff about people." ER 130. Chaker was sentenced to time served, ER 6, and 30 additional months of supervised release.

The district court did impose additional special conditions of release. Like Judge Atlas, the district court again explained that Chaker maintained his right to "opine on matters of public interest." ER 131; ER 138 ("I'm not otherwise forbidding you from posting opinions on the Internet, posting information, reposting

truthful information.  You can do all that.").  But the district court cautioned Chaker that "I want you to understand, no more posting stuff to get leverage against people.  No more doing that.  No more revealing private facts about people or threatening to do that in exchange for getting conduct from them[.]"  ER 137; ER 131 ("[I]in the context of your background, the fact that you're on felony supervised release[,] and you have a documented history of trying to harass people or extort people by posting stuff, don't do that anymore, don't do that."); ER 138 ("The concern I have is the same as Judge Atlas had is that you not be vindictive and use the internet as a tool for getting back at people or trying to extort people, and that's what I think has happened so don't do that."); ER 146 ("What I'm talking about is you doing something like what you did to Ms. Fazal.  That's very discrete, can be described very easily:  it's making up something false and posting it in order to get leverage against a person.  Don't do that.")

Chaker opposes three of the special conditions on appeal now: Condition 5, which was the same harassment condition imposed by Judge Atlas; Condition 11, prohibiting Chaker from revealing "private information of others or threaten[ing] others by posting false information, [or] disparage[ing] or defam[ing] others on the internet"; and part of Condition 13, which originally

27

prohibited Chaker from sending "bogus emails," but was clarified to prohibit Chaker from "spoofing" or sending "anonymous" emails.  ER 8, ER 26-29.

## SUMMARY OF ARGUMENT

1.    Chaker is on supervised release.  As such, he is just "one step removed from imprisonment," *Doe v. Harris*, 772 F.3d 563, 571 (9th Cir. 2014), and subject to conditions of release that abridge his fundamental rights.  This Court has upheld numerous conditions that limit a supervised releasee's essential liberties, so long as they are reasonably necessary to rehabilitate an offender, protect the public, or deter the defendant from future crimes. Rights protected by the First Amendment are not insulated from such conditions.  This Court has repeatedly upheld supervised release conditions that infringe on a supervised releasee's First Amendment associational rights; that infringe on religious rites of passage; that force supervised releasee's to speak; and that limit a supervised releasee's access to otherwise protected speech.

Both Chaker and Amici essentially ignore the fact that Chaker is on supervised release in challenging the supervised release condition on First Amendment grounds.  They ignore the fact that Chaker had amassed a nearly two-decade history of harassing and stalking others.  And they ignore the district court's

28

efforts to rehabilitate Chaker. Effectively, they ignore the fact that Chaker is in a materially different position than the ordinary citizen whose First Amendment rights are unabridged. As a result, their extensive First Amendment analyses are largely immaterial.

The record reflects that the district court did not abuse its discretion by crafting an anti-harassment condition designed to address Chaker's specific, demonstrated issues in harassing others. The plain language of the condition prohibits all harassment, whether the speech would be protected by the First Amendment or not. And the intrusions on the First Amendment are permissible because they are reasonably necessary to rehabilitate Chaker.

2. The district court did not abuse its discretion in revoking supervised release either. A rational finder of fact could have concluded that the evidence, when viewed in the light most favorable to the government, demonstrated by a preponderance of the evidence that Chaker intended to harass Leesa Fazal once more. She was a prior victim of Chaker's harassment and Chaker posted information about her on six additional occasions while on supervised release. The district court plausibly concluded that

Chaker intended to harass her when he made the internet postings.

3.    Finally, the district court did not abuse its discretion in crafting three additional conditions of release.  Each aimed to curb Chaker's history of harassment; read with that gloss, the conditions reasonably related to the goals of deterrence, protection of the public, and/or defendant rehabilitation; and involve no greater deprivation of liberty than is reasonably necessary to achieve those goals.  The amended judgment should be affirmed.

**ARGUMENT**

A.    The Plain Language of the Condition Imposes Limits on Chaker's First Amendment Rights to the Extent He Engages in Speech or Conduct That Harasses Others

1.    *Standard of Review*:    This Court reviews de novo matters of law, like the interpretation of a condition of supervised release.  *United States v. Sandsness*, 988 F.2d 970, 971 (9th Cir. 1993) ("Matters of law are reviewed de novo."); *United States v. Gallo*, 20 F.3d 7, 11 (1st Cir. 1994) ("[T]he interpretation of a probation condition and whether it affords a probationer of fair waning of the conduct proscribed thereby are essentially matters of law and, therefore, give rise to de novo review on appeal.").  Whether a supervised release condition violates the Constitution

30

is also reviewed de novo. *United States v. Watson*, 582 F.3d 974, 980-81 (9th Cir. 2009).

2. The language of a supervised release condition is interpreted "as it is written," and cannot be interpreted contrary to its plain language, *United States v. Acquino*, 794 F.3d 1033, 1037 (9th Cir. 2015), though all conditions of supervised release are read to "require an element of mens rea." *United States v. Gnirke*, 775 F.3d 1155, 1162 (9th Cir. 2015); see also *United States v. Soltero*, 510 F.3d 858, 867 n.9 (9th Cir. 2007) ("Generally supervised release provisions are read to exclude inadvertent violations.") (quoting *United States v. Johnson*, 446 F.3d 272, 281 (2d Cir. 2006)).

The special condition imposed by Judge Atlas provided that Chaker "may not stalk and/or harass other individuals, to include, but not limited to, posting personal information of others or defaming a person's character on the internet." ER 268. By its terms, then, the condition forbids Chaker from stalking other individuals—that is to say that Chaker may not "pursue or follow in a stealthy, furtive or persistent manner." Webster's Third New Int'l Dictionary 2221 (1981); see also Black's Law Dictionary 1440 (8th ed. 2004) (defining stalking as "the act or an instance of following another by stealth" or "the offense of following or

loitering near another, often surreptitiously, with the purpose of annoying or harassing that person"); cf. Black's Law Dictionary 415 (8th ed. 2004) (defining cyberstalking as "the act of threatening, harassing, or annoying someone through multiple e-mail messages, as through the internet, esp. with the intent of placing the recipient in fear that an illegal act or an injury will be inflicted on the recipient or a member of the recipient's family or household").

The condition also commands that Chaker may not "harass other individuals," meaning that he may not "vex, trouble or annoy continually or chronically," or "plague and bedevil" others. Webster's Third New Int'l Dictionary 1031 (1981). That prohibition covers "words, conduct or action (usually repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose." Black's Law Dictionary 733 (8th ed. 2004); see also *United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014) (relying on "common understanding" of the term "harass" in federal statute and quoting the Black's Law Dictionary definition with approval).

The special condition provides a non-exhaustive list of conduct that could constitute stalking or harassment. See ER 268

(identifying conduct that could constitute harassment by using phrase "to include, but not limited to"). That would include, for example, "posting personal information of others" with the intent to harass others, or "defaming a person's character on the internet" with the same intent. *Id.*; see also Webster's Third New Int'l Dictionary 590 (1981) (defining defame to mean "to harm or destroy the good fame of: make infamous: bring into disgrace" "to harm the reputation or good name of by uttering injurious charges: libel, slander"); Black's Law Dictionary 733 (8th ed. 2004) (defining defamation as "the act of harming the reputation of another by making a false statement to a third person. If the alleged defamation involves a matter of public concern, the plaintiff is constitutionally required to prove both the statement's falsity and the defendant's fault. A false written or oral statement that damages another's reputation"). But unless such posting of personal information or defamation of character is done to "stalk and/or harass" others, it is not covered by the special condition. Cf. *Chickasaw Nation v. United States*, 534 U.S. 84, 90-91 (2001) (items on illustrative list must be read in light of the category the list is meant to illuminate).

By its plain terms, the condition does not carve out First Amendment protected speech from its scope. See Appellant's

33

Opening Brief 21. As Chaker recognizes, "there is no categorical exception to the First Amendment for harassing . . . speech," Appellant's Opening Brief (AOB 23) (quoting *Osinger*, 753 F.3d at 953 (Watford, J., concurring)), and the condition plainly prohibits just that: the harassment of others, without regard for the legality or illegality of the speech. See also *Rodriguez v. Maricopa Cty. Commun. College Dist.*, 605 F.3d 703, 708 (9th Cir. 2010) ("There is no categorical harassment exception to the First Amendment's free speech clause.") (internal quotation omitted); see generally Eugene Volokh, *One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and Cyberstalking*, 107 Northwestern Univ. L. Rev. 731, 751 (2013) (generally describing constitutional protections for speech, even if it is insulting or discriminatory).

According to Chaker, the condition nonetheless must be read to prohibit only conduct rising to the level of criminally-actionable harassment; that is, speech that is not protected by the First Amendment, such as incitement, fighting words, "true threats," or "speech integral to criminal conduct." AOB 23. To support his interpretation of the condition, Chaker avoids the plain language, and ties his interpretation to three other things: (1) Judge Atlas's remarks at the time the condition was imposed; (2) his claim that

the condition otherwise offends due process; and (3) his claim that the condition is overbroad.  None supports his claim.

      a.   Even if the plain language of the condition could be avoided,[1] Judge Atlas did not intend to exclude First Amendment protected speech from the scope of the condition.  Chaker contends that Judge Atlas "made clear that the stalking/harassing/defaming condition did not sweep in First Amendment protected speech."  AOB 21.  Judge Atlas, however, articulated the precise opposite.  As Judge Atlas explained to Chaker, "you don't need to be publicizing people's personal information *whether it's legal or not*."  SER 440 (emphasis added).  The condition required Chaker to "take the high road.  We're not talking about legal.  We're not talking about First Amendment.  We're talking about give people the benefit of the doubt."  SER 439.

      Rather than carve out speech from the condition, Judge Atlas's discussion of the First Amendment instead addressed

---

[1]    A limiting construction of a supervised release condition is permissible only if it is "readily susceptible to such a construction."  *Gnirke*, 775 F.3d at 1171 (Smith, J. concurring) (quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 946 (9th Cir. 2011) (en banc)).  The plain language here covers all harassment of others, whether it would rise to the level of criminally or civilly actionable conduct.

Chaker's historical efforts to seek refuge in the First Amendment.[2] As Judge Atlas explained, that would not insulate Chaker from liability while on supervised release. While Judge Atlas agreed in principle that the First Amendment protected important interests, SER 437 ("I, too, Mr. Chaker, believe in the First Amendment as I told you at the end of the last hearing."), Judge Atlas immediately followed those remarks with limits on those rights that would be imposed. Thus, Chaker could not "threaten[] indirectly to invade people's privacy or harm them by putting things up on the internet such as home addresses with comments that you are going to—you won't harm someone, but you know others who may," SER 438; and, "[t]here's a difference between protecting your own First Amendment rights and harassing or invading the privacy of others." SER 437.

---

[2] See, e.g., SER 439; see also SER 326("photography is a form of speech and reposting publicly available information is protected"); SER 322 (stating that his harassing communications were protected because they did not "cross the line of defamation while any statement will be reasonably couched in opinion"); see also SER 315 (Chaker threatening to "publish information within the scope of my First Amendment right" which tied Speth's law firm to allegations of sexual misconduct); SER 331 ("Most recently, a federal appellate court determined it was not unlawful to repost social security number information on the Internet since such is within the scope of the First Amendment."); SER 345 ("I have been forced to email 140 attorneys in Phoenix for representation . . . Of course, merely contacting attorneys for representation is not actionable.").

The plain language of the condition aligns with the harm that Judge Atlas aimed to redress. The condition was imposed to address the speech and conduct that formed the basis for his bond revocation hearing, as well as the "extensive information about . . . invasive" speech described in the PSR. SER 437. As Judge Atlas stated, that speech and conduct could have been legal—as Chaker often boasted—and protected by the First Amendment. *Id.* ("I don't know if it's illegal . . . I'm not saying it's criminal."). Nonetheless, Judge Atlas sought to limit such (legal) conduct, when it constituted harassment within its common understanding. SER 437-38 ("So one of your conditions is that you may not stalk or harass others.").

Judge Atlas was not required to carve out protected speech from the condition to remain consistent with First Amendment requirements, as Chaker contends. AOB 29 ("By misinterpreting the condition to permit restriction of Mr. Chaker's First Amendment rights, . . . the court sanctioned Mr. Chaker *for speech that was not sanctionable*.") (emphasis added). As a person on supervised release, Chaker is just "one step removed from imprisonment." *Doe*, 772 F.3d at 571. The essence of supervised release "is release from prison, before the completion of the sentence, on the condition that the prisoner abide by certain rules

37

during the balance of the sentence." *Id.* As a result, the government "may impose restrictions on the rights of the [supervised releasee] that are reasonably and necessarily related to the government's interest." *Id.*

Consistent with that, this Court has upheld a host of intrusive conditions for supervised releasees that would offend the Constitution were the same condition imposed on the general citizenry. See *United States v. Lowe*, 654 F.2d 562, 568 (9th Cir. 1981) ("While such limitation would, of course, be improper if imposed upon the ordinary citizen, probationers 'properly are subject to limitations from which ordinary persons are free.'"). For example, this Court has upheld the suspicion-less collection of DNA from individuals on supervised release. *United States v. Kincade*, 379 F.3d 813, 834 (9th Cir. 2004) (en banc). ("The transformative changes wrought by a lawful conviction and accompanying term of conditional release are well-recognized by the Supreme Court, which often has noted that conditional releasees enjoy severely constricted expectations of privacy relative to the general citizenry—and that the government has a far more substantial interest in invading their privacy than it does in interfering with the liberty of law-abiding citizens."). This Court has upheld a condition permitting the search of a

defendant's personal computers. *United States v. Bare*, No. 14-10475, 2015 WL 7434629, *5-6 (9th Cir. 2015). And this Court has blessed conditions requiring supervised releasees to complete substance abuse treatment programs, *United States v. O'Donnell*, 482 F. App'x 256, 258 (9th Cir. 2012); requiring supervised releasees to abide by conditions of community confinement, *United States v. Bahe*, 201 F.3d 1124, 1128 (9th Cir. 2012); requiring a supervised releasee to perform community service and abstain from alcohol consumption, *United States v. Vega*, 545 F.3d 743, 747-48 (9th Cir. 2008); and even prohibiting a supervised release from entering a city where he had his childhood residence, family and friends. *United States v. Watson*, 582 F.3d 974, 984 (9th Cir. 2009).

Restrictions on First Amendment rights are no different. This Court has upheld limits on First Amendment associational rights of supervised releasees.[3] See, e.g., *United States v. Furukawa*, 596 F.2d 921, 923 (9th Cir. 1979) ("[I]t is beyond question that preventing a probationer from associating with those apparently involved in criminal activities is 'reasonably

---

[3] In this context, courts analyze probationers identically to supervised releases. See, e.g., *Kincade*, 379 F.3d at 817 n.2 ("Our cases have not distinguished between parolees, probationers, and supervised releasees for Fourth Amendment purposes.").

related' to the probationer's rehabilitation and protection of the public."); *United States v. Bolinger*, 940 F.2d 478, 480 (9th Cir. 1991) (upholding condition prohibiting probationer from associating with motorcycle clubs because conditions "may seek to prevent reversion into a former crime-inducing lifestyle by barring contact with old haunts and associates, even though the activities may be legal"); *United States v. Ross*, 476 F.3d 719, 722 (9th Cir. 2007) (upholding condition limiting supervised releasee's right to associate with neo-Nazi/white supremacist groups because the "interests of rehabilitation and public safety would be served by separating [the defendant] from neo-Nazi/white supremacist influences"); *United States v. Soltero*, 510 F.3d 858, 866 (9th Cir. 2007) (upholding condition prohibiting supervised releasee from associating with any known member of any criminal street gang); *United States v. Hayes*, 283 F. App'x 589, 593 (9th Cir. 2008) (unpublished) (upholding condition prohibiting contact with family members). It has upheld limits on activity that would constitute a "religious rite of passage" under the Free Exercise clause of the First Amendment. *United States v. Juvenile #1*, 38 F.3d 470, 473 (9th Cir. 1994). It has limited a defendant's access to protected speech. *United States v. Bee*, 162 F.3d 1232, 1235 (9th Cir. 1998) (supervised releasee may not possess sexually stimulating or

sexually oriented material); *Gnirke*, 775 F.3d at 1167. And it has upheld conditions forcing supervised releasees to speak. *United States v. Clark*, 918 F.2d 843, 848 (9th Cir. 1990) (upholding condition requiring probationers to make a public apology because it may "serve a rehabilitative purpose"), overruled on other grounds, *United States v. Keys*, 133 F.3d 1282 (9th Cir. 1998).

Conditions that affect fundamental rights, even the First Amendment, are therefore not prohibited. They are just "reviewed carefully." *United States v. Wolf Child*, 699 F.3d 1082, 1089 (9th Cir. 2012). Such conditions are examined to ensure that they (1) are reasonably related to the goals of deterrence, protection of the public, and/or defendant rehabilitation; (2) involve no greater deprivation of liberty than is reasonably necessary to achieve those goals; and (3) are consistent with any pertinent policy statements issued by the Sentencing Commission. *Id.* at 1090. A district court's discretion to impose conditions of supervised release "is broad even where those conditions affect fundamental rights." *Soltero*, 510 F.3d at 866.

Judge Atlas did not abuse her discretion by imposing the condition. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (abuse of discretion test looks at "whether the trial court's application of the correct legal standard was (1) 'illogical,'

(2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record'"). The court had considered "extensive" information involving Chaker's protracted history of harassing others. SER 437. Judge Atlas considered nearly two decades of Chaker's obsessive efforts to seek vengeance against others, as it was reported in the PSR and, "most important[ly]," the information conveyed by Speth and Fazal at the bond revocation hearing. *Id.* And the court had concluded that Chaker acted inappropriately when he was "upset with someone who you think has been unfair or mistreated you." SER 438. The condition, along with a mental health counseling provision, was designed to help Chaker "make these determinations to treat others as you hope to be treated yourself." SER 440.

Judge Atlas earlier had expressed her concern that "Mr. Chaker, when he's very upset, takes extraordinary measures intended to harm others either in their reputation or in their person, either by raising the profile of those people in order for others to retaliate or by Mr. Chaker retaliating." SER 287. Judge Atlas described how Chaker engaged in a "pattern of harassment and intimidation of others when he feels it is important to get his way." SER 285. She specifically identified how Chaker used

information as a leverage tool to exact compliance with his demands:

> Mr. Chaker, through his emails and his use of the internet is intimidating and posing a threat, a serious threat to people by repeatedly posting their home addresses with statements that raise the hint of danger or suggestions that things could happen. It can incite others and it can also indicate a pattern or an intent of his. It was clearly for intimidation and I think it poses danger to the safety of those lawyers. . . . And the fact of the matter is, that Mr. Chaker's conduct is a problem.

SER 286.

Judge Atlas's effort to address that problem was reasonably related to a valid rehabilitative goal. *Bolinger*, 940 F.2d at 480 (conditions "may seek to prevent reversion into a former crime-inducing lifestyle by" limiting protected activities, "even though the activities may be legal"). It also aimed to protect the public and deter Chaker from continued harassing (and often escalating) conduct.

The condition reasonably fit the problem it was designed to address. It involves no greater deprivation of liberty than is reasonably necessary to achieve those goals. The "touchstone of reasonableness is whether the record as a whole reflects rational and meaningful consideration" of the relevant factors. *Gnirke*, 775

F.3d at 1168. Judge Atlas engaged in such rational and meaningful consideration.

The condition does not prohibit all speech online about others. It limits only speech or conduct that is intended to harass. *Soltero*, 510 F.3d at 867 n.9 ("Generally supervised release provisions are read to exclude inadvertent violations."). That mens rea therefore "mitigates to some extent" infringement on Chaker's First Amendment rights. *Gnirke*, 775 F.3d at 1162. Requiring intent to harass excludes substantial protected speech from the scope of the condition.[4] Indeed, many of Chaker's proffered examples of speech that he claims are covered by the condition would not fall within the scope of the condition at all. Thus, posting a complaint about police brutality on a message

---

[4]     In *United States v. Richards*, 385 F. App'x 691, 692-93 (9th Cir. 2010), this Court struck down a condition prohibiting a defendant from making "any public comment regarding [a harassment victim] or any of her family members, whether published in a newspaper or otherwise." That victim had been the subject of a harassment campaign over the course of three years and had cooperated with law enforcement in an investigation that led to the defendant's indictment. *Id.* The district court believed that the condition would address the "purposes of rehabilitation." This Court concluded that the condition was overbroad under the First Amendment. *Id.* at 693. The condition here, however, is substantially narrower. It is limited to harassing comments, not "any" comments, which is tailored to cover the valid rehabilitative goals identified by Judge Atlas. Moreover the speech here must be delivered with the intent to harass.

board, or writing a negative Yelp review, AOB 43-44, would not be speech that is intended to constitute harassment within the meaning of its common understanding and Chaker is not at risk for revocation on those grounds.[5]

Chaker's chief complaint is that the condition is overbroad because it encroaches on First Amendment protected speech. AOB 43. But as explained above, that is not unlawful overbreadth, but a permissible restriction on a supervised releasee. The condition is not overbroad simply because it impairs some First Amendment protected speech. The deprivation must be greater than reasonably necessary to facilitate the goals of supervised release. That is not the case here.

Chaker alternatively contends that "the goals of supervised release arguably are served by other conditions, including participation in anger management, and mental health counseling programs, and prohibition on committing crimes." AOB 60. But while other conditions may also assist in Chaker's rehabilitation, prohibiting him from engaging in the sort of intentional harassment campaigns he waged over two decades—some of it

---

[5]  Nor would Dr. Martin Luther King, Jr.'s writings or the essay *Living with an Ankle Bracelet* constitute harassment because neither author intended to harass others. See Brief for Amici at 9-10.

while on pretrial release on a federal case—is reasonably related to that goal as well. In light of Chaker's historical conduct, "it is not clear what narrower condition would work" to curb that behavior and facilitate his rehabilitation. *Watson*, 582 F.3d at 984; see also *id.* (noting defendant's failure to "suggest any alternative, more limited" condition "to aid the district court in the exercise of its discretion").

b. Chaker also contends that the condition must be read to carve out First Amendment protected speech, because it is otherwise so vague that it offends due process. Chaker argues that Judge Atlas purportedly assured him that the condition did not reach First Amendment protected conduct, so that he could not have been on notice that protected speech could get him in trouble. And he also argues that the revocation court's definition "was internally inconsistent and inconsistent with binding law" and otherwise so confusing that the condition must be vague. AOB 29-30; see generally AOB 29-43. Neither is true.

A condition of supervised release violates due process of law if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Hugs*, 384 F.3d 762, 768 (9th Cir. 2004). None of the terms used

in the condition suffer from such defect. Chaker has not suggested that the term "stalk" is vague; nor does he argue that the term "harass" alone is vague. Nor could he. As this has Court explained, "harass" is not an "esoteric or complicated term[]" devoid of common understanding." *Osinger*, 753 F.3d at 945. It clearly covers "words, conduct or action (usually repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose." Black's Law Dictionary 733 (8th ed. 2004). And its bound is made more clear by the scienter requirement for all supervised release conditions. *Gnirke*, 775 F.3d at 1162; *Soltero*, 510 F.3d at 867. Chaker must intend to harass to be in violation of the condition, which "thoroughly undermines [Chaker's] contention that he was unable to discern that his harassment" is prohibited by the condition. *Osinger*, 753 F.3d at 945.

Judge Atlas's remarks could not sow confusion. Chaker contends that Judge Atlas excluded First Amendment protected speech from the scope of the condition; and that any interpretation that sweeps in such speech is vague. But Judge Atlas did not, as explained above, articulate such an exclusion. In any event, the plain language of the condition is not susceptible of such an

47

interpretation. See *Rodriguez*, 605 F.3d at 708 ("There is no categorical harassment exception to the First Amendment's free speech clause.").

Nor does the revocation court's interpretation of the condition make it vague. Chaker points to the revocation court's purported "misinterpretation of *Osinger*," its "defamation-lite" analysis, and its "that kind of thing standard" to suggest that the condition is unworkable. *Id.*; see also AOB 41 ("*[T]he court's interpretation* put Mr. Chaker at risk of arbitrary and discriminatory enforcement by probation.") (emphasis added). But even if the revocation court's comments could be construed to sew a "motley definition of the condition" as Chaker contends, AOB 41, the revocation court's interpretation of the condition is irrelevant for this due process analysis.[6] That is because the condition is interpreted by this Court de novo. And as explained above, the plain language of the condition controls. It is therefore the plain language that is reviewed for due process vagueness. And the terms used in the condition, like "harass," are not so "esoteric or

---

[6]    Moreover, even if the revocation court had offered a different interpretation of the condition, that fact does not make the condition vague. Cf. *United States v. Morrison*, 686 F.3d 94, 104 (2d Cir. 2012) ("[I]t is manifest that conflicts between courts over the interpretation of a criminal statute do not in and of themselves render that statute unconstitutionally vague").

complicated" that they are devoid of common understanding. Although Chaker appears to agree that the interpretation of a supervised release condition is reviewed de novo, AOB 20, he still devotes considerable sections of his brief to challenge selected snippets from the revocation court's analysis of the condition to support his claim that it is vague. AOB 29-43. That cannot prove a due process defect in the condition.

c. Finally, for the reasons set forth above, the condition involves no greater deprivation of liberty than is reasonably necessary to achieve the goals of supervised release. The condition is not "overbroad" simply because it sweeps in First Amendment covered speech. AOB 44. As a convicted felon on supervised release, with a demonstrated history of harassing others, Chaker was reasonably required to comply with conditions crafted to rehabilitate him.

B.   Sufficient Evidence Supported Chaker's Revocation of Supervised Release

1. *Standard of Review*: The district court's decision to revoke supervised release is reviewed for abuse of discretion. *United States v. Verduzco*, 330 F.3d 1182, 1884 (9th Cir. 2003). The district court's factual findings are reviewed for clear error. *United States v. Lomayaoma*, 86 F.3d 142, 146 (9th Cir. 1996).

2.     The district court did not abuse its discretion in revoking Chaker's supervised release.  "On a sufficiency of the evidence challenge to a supervised release revocation," this Court considers whether, "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of a violation by a preponderance of the evidence."  *Aquino*, 794 F.3d at 1035-36; see also 18 U.S.C. § 3583(e)(3).  The evidence, so viewed, supports that Chaker harassed and intended to harass others (Leesa Fazal).

Chaker admitted that he had posted information online about Fazal on Twitter, the blog leesafazal.blogspot.com, and on slideshare.net.  As Chaker had earlier indicated, the blog was designed to harass Fazal.  SER 227.  Then between October 2014 and January 2015, Chaker had posted information about Fazal on at least 6 occasions.  In one blog post, Chaker wrote "Nevada Attorney General Investigator Leesa Fazal, is well known for making false statements in federal court.  If you are a criminal defense or civil rights attorney, material may be shared with you concerning false statements made by Fazal including court transcripts, public records requests, interviews with former neighbors, why Fazal was forced out of the Las Vegas Metro Police Department, along with interesting background of family, and

50

other credible material for impeachment. In my opinion, she exaggerates and thinks court is a soap opera, and believes her false statements will be forgotten." SER 538.

The posts caused Fazal fear. She reported that "he is illustrating yet another pattern of obsession and I am in fear given his extensive history of stalking that it will only progress especially considering I have had no involvement in any of his cases in any way for well over a year." *Id*. The district court considered whether the blog post constituted harassment and whether Chaker had posted the information with the intent to harass Fazal. ER 100 ("I mean that's what I'm focusing on is whether it's harassment[.]"); ER 107 ("I told you I was going to infer a requirement of scienter here, that he did it with the intent to harass[.]"); ER 118 (using ordinary, dictionary meaning of harassment). Considering the evidence before him (and Chaker's history with Fazal and others), and the fact that Chaker likely made up the claim that Fazal had been "forced out" of the Las Vegas police department, it was not implausible for the district court to conclude that the post constituted harassment. *United States v. Alexander*, 106 F.3d 874, 877 (9th Cir. 1997) (defining "clear error"). Nor was it implausible to conclude that Chaker had posted the information—in particular the post about Fazal having

been "forced out" of the Las Vegas Metro Police Department—with harassing intent. ER 128 ("I find that he had the intent to be vindictive when he did this and that he posted a false statement about her reputation, professional reputation in an attempt to intimidate her or get her to back off or do what he wanted."); ER 107 ("[T]hat seems manifest here."); ER 119 ("He's doing it because he's mad at her and vindictive."); ER 125 ("what I'm focusing on is a posting that I find to be vindictive"); ER 126 ("That was an out-and-out lie I think by him that he's trying to exploit to get her to back off or do what he wants. And that's the gist of this is that it's using information as a lever, a wedge against people and threatening in an extortionate way. That's what's implicated here."); ER 112-13 (concluding that Chaker posted the information "because he's mad at—at Ms. Fazal on her, you know, pursuing investigation different from the one he wanted or reaching conclusions that he didn't' agree with . . . I mean if that's it, then, you know, he's intending to harass her by putting this stuff on there. I mean, that's the conclusion I'd draw."); ER 136 ("I thought that you published in a vindictive, spiteful way.").

The six posts constituted "words, conduct or action ([both] repeated [and] persistent) that, being directed at a specific person,

annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose." Black's Law Dictionary 733 (8th ed. 2004). A preponderance of the evidence supports the view that Chaker continued to harass Fazal once he was released from custody to retaliate against her. Given the district court's factual finding that Chaker uttered the words with the intent to harass, it was not an abuse of discretion to revoke supervised release.

3.     Chaker's contrary claim rests on alleged evidentiary deficiencies relating to issues that were not required to be proven. Chaker argues that there was insufficient proof of falsity; insufficient proof that Chaker's assertions delivered facts, as opposed to an opinion; no evidence of vindictive motive; and insufficient proof of extortionate aim or damage to reputation.[7] AOB 45-52. Those alleged deficiencies arise, however, from an improper interpretation of the condition's restrictions. Chaker violated the condition if a preponderance of the evidence showed only that Chaker "harass[ed] other individuals," meaning that he used "words, conduct or action ([both] repeated [and] persistent)

---

[7]     Even if the United States were required to prove those facts to support proof of harassment, the district court did not clearly err in concluding that the posts contained false information, that they purported to convey facts, that Chaker harbored a vindictive motive and that Fazal suffered harm from the posts.

that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose" and intended to do so. Black's Law Dictionary 733 (8th ed. 2004). The evidence so established here.

C. The Revocation Court Did Not Abuse Its Discretion in Imposing Conditions 5, 11 and 13.

Chaker opposes three of the special conditions imposed by the revocation court. Chaker challenges Condition 5, which was the same harassment condition imposed by Judge Atlas; Condition 11, which prohibits Chaker from revealing "private information of others or threaten[ing] others by posting false information, [or] disparag[ing] or defam[ing] others on the internet"; and part of Condition 13, which originally prohibited Chaker from sending "bogus emails," but was clarified to prohibit Chaker from "spoofing" or sending "anonymous" emails. ER 8, ER 26-29.

1.  *Standard of Review*: This Court reviews for abuse of discretion conditions of supervised release set by the district court and challenged on appeal. *Aquino*, 794 F.3d at 1036. Whether a condition violates the Constitution is reviewed de novo. *Id.*

2.  For all the reasons identified above, the district court did not abuse its discretion by imposing Condition 5 (the same

54

harassment condition imposed by Judge Atlas). It is reasonably tailored to address the goals of supervised release and involves no greater deprivation of speech than reasonably necessary.

The same is true of Condition 11. Although Condition 11 was added as a standalone condition, the district court made clear that its intent was to curb harassment. As the district court explained,

> I'm adding to the supervised release conditions that you not do any of the three things I told you about: Reveal private information about people on the internet, threaten people by posting false information in exchange for some kind of action from them, or disparage people or defame people in exchange to try to get them to change behavior. Don't do that because all of those three things constitute harassment.

ER 138. Although terms in statutes and supervised release conditions are ordinarily read to avoid "redundancy," AOB 56, the so-called "anti-superfluousness" canon is "merely an interpretive aid, not an absolute rule." *Corley v. United States*, 556 U.S. 303, 325 (2009). Where it is clear—as here—that redundancy is intended, the provisions may be interpreted consonant with one another. Given the revocation court's intent to prohibit "things [that] constitute harassment," ER 138, the condition simply provides examples of conduct that could constitute harassment when spoken or conducted with harassing intent. Cf. *Gnirke*, 775

55

F.3d at 1166 (construing facially broad condition more narrowly in part based on district court's stated intent).  As such, for the reasons that Condition 5 is not an abuse of discretion, the same is true of Condition 11.[8]

Condition 13 was originally imposed to prohibit Chaker from sending "bogus emails using a different email address."  ER 8.  It was modified orally approximately one month later to prohibit Chaker from sending spoofed emails, as well as anonymous emails.  ER 27-29.  In a minute entry, Condition 13 was clarified to read that Chaker "shall not send anonymous emails/no spoofing allowed."  R. 46; ER 277.  Chaker does not challenge the

---

[8]  Without limiting the condition to harassment, Condition 11 would likely cover more conduct than reasonably necessary to promote the goals of rehabilitation, public safety and deterrence.  But the revocation court here made clear that only harassment was covered.  For that reason, Amici's focus on the "disparagement" and "defamation" clauses in Condition 11—without reference to harassment—is largely irrelevant.  The clauses cannot be read untethered from the ultimate goal of limiting Chaker's harassing behavior and speech.  In any event, Amici raise arguments that Chaker himself did not raise.  "In the absence of exceptional circumstances," this Court does "not address issues raised only in an amicus brief."  *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 (9th Cir. 2003).  Moreover, as described above, Amici largely ignore Chaker's status as a supervised releasee and show little awareness of Chaker's history and characteristics.  Amici's suggestion that the revocation court could not impose conditions that infringe on First Amendment rights at all is simply incorrect.

prohibition on spoofed emails, but appeals the condition prohibiting anonymous emails.

The anonymous email provision aimed to prevent Chaker from disclaiming communications as his. The district court viewed anonymous emails to be a "recipe for him to do something that he shouldn't do again and then say oh, that's not me, it didn't say Darren Chaker on it." ER 28. But the condition did not prohibit Chaker from otherwise speaking anonymously, as he was permitted to post blogs online anonymously, or even under a pseudonym. ER 28. This Court observed in an analogous context that combatting anonymity is appropriate as a condition of supervised release, when anonymity offers a "convenient means of continued harassment." *Hayes*, 283 F. App'x at 594. In *Hayes*, this Court upheld a computer search condition "given Hayes' history of threats and volatile behavior." *Id.* "[T]he district court could have reasonably concluded that allowing Hayes' probation officer to inspect and monitor Hayes' personal computer, which, in turn, may deter Hayes from utilizing another viable means of sending threats to his family, was reasonably necessary to achieve deterrence or public protection." *Id.* The same is true here. Chaker is a convicted liar, who repeatedly used varied methods including repeated emails, some not in his name, to harass his

victims. He engaged in harassing conduct while under a federal court's pretrial supervision. And he had a 20-year history of engaging in harassment. The district court reasonably concluded that limiting anonymous emails could deter Chaker from utilizing another viable means of harassing others, and was therefore reasonably necessary to achieve deterrence, rehabilitation and public protection.[9]

### CONCLUSION

The district court's amended judgment should be affirmed.

Respectfully submitted,

> LAURA E. DUFFY
> *United States Attorney*
>
> PETER KO
> *Assistant U.S. Attorney*
> *Chief, Appellate Section*
> *Criminal Division*
>
> S/HELEN H. HONG
> *Assistant U.S. Attorney*
>
> DECEMBER 9, 2015.

---

[9] To the extent the condition is overbroad, it may be "readily susceptible" to a limiting construction like Condition 11. The context demonstrates that the district court aimed to limit harassment. Reading Condition 13 to reach only anonymous emails sent to harass others would fulfill that goal.

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,125 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word 2010.

**STATEMENT OF RELATED CASES**

The United States is unaware of any related cases.

s/HELEN H. HONG
  *Assistant U.S. Attorney*

DECEMBER 9, 2015.

A1